## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **TPI HOLDINGS, INC.**, and **DOMINION ENTERPRISES,** | |
| Plaintiffs, | CIVIL ACTION NO. 1:09-cv-0801-CAP |
| v. | |
| **WINFIELD DYCO HOLDING LTD.**, and **NATCO TRADING COMPANY, INC.** | |
| Defendants. | |

## DEFENDANTS WINFIELD DYCO HOLDING LTD. AND NATCO TRADING COMPANY, INC.'S ANSWER AND COUNTERCLAIM

Defendants Winfield Dyco Holding Ltd. and Natco Trading Company, Inc. (collectively, "Defendants"), in answer to the Amended Complaint of Plaintiffs TPI Holdings, Inc., and Dominion Enterprises (collectively, "Plaintiffs"), herein admit, deny, and aver as follows:

### NATURE OF ACTION

1.    The allegations contained in Paragraph 1 call for a conclusion of law to which no response is required. To the extent that a response is required, Defendants deny knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 1, and on that basis, deny the same.

## JURISDICTION

2.　　The allegations contained in Paragraph 2 call for a conclusion of law to which no response is required.  To the extent that a response is required, Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 2, and on that basis, deny the same.

3.　　The allegations contained in Paragraph 3 call for a conclusion of law to which no response is required.  To the extent that a response is required, Defendants deny the same.

4.　　The allegations contained in Paragraph 4 call for a conclusion of law to which no response is required.  To the extent that a response is required, Defendants deny the same.

## PARTIES

5.　　Defendants admit that Exhibit A is a printout from the Georgia Secretary of State's website reflecting an "entity search" for TPI Holdings, Inc. Defendants deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 5, and on that basis, deny the same.

6.　　Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 6, and on that basis, deny the same.

7.　　Defendants admit the allegations in Paragraph 7.

8.    Defendants admit the allegations in Paragraph 8.

## FACTUAL BACKGROUND
### Plaintiffs' Trademark and Service Mark Rights

9.    Defendants deny that Plaintiffs or Plaintiffs' predecessors in interest, licensees, and/or affiliates have any exclusive rights in the TRADER Marks. Defendants deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 9, and on that basis, deny the same.

10.    Defendants deny that Plaintiffs or Plaintiffs' predecessors in interest, licensees, and/or affiliates have any exclusive rights in the TRADER Marks. Defendants deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 10, and on that basis, deny the same.

11.    Some of the allegations contained in Paragraph 11 call for a conclusion of law to which no response is required.  To the extent that a response is required, Defendants deny that Plaintiffs or Plaintiffs' predecessors in interest, licensees, and/or affiliates have any exclusive rights in the TRADER Marks or any of the marks identified in the table set forth in Paragraph 11.  Defendants admit that Exhibit B comprises documents and printouts from U.S. Patent and Trademark Office regarding the purported trademarks identified in the table set forth in Paragraph 11.  Defendants deny knowledge or information sufficient to form a

belief as to the truth of the remaining allegations in Paragraph 11, including the truth and accuracy of the substance of Exhibit B, and on that basis, deny the same.

12.    Defendants deny that Plaintiffs or Plaintiffs' predecessors in interest, licensees, and/or affiliates have any exclusive rights in the TRADER Marks. Defendants deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 12, and on that basis, deny the same.

13.    Defendants deny that Plaintiffs or Plaintiffs' predecessors in interest, licensees, and/or affiliates have any exclusive rights in the TRADER Marks or TRADER domain names.  Defendants deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 13, and on that basis, deny the same.

14.    Defendants deny that Plaintiffs or Plaintiffs' predecessors in interest, licensees, and/or affiliates have any exclusive rights in the TRADER Marks or TRADER domain names.  Defendants deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 14, and on that basis, deny the same.

15.    Defendants deny the allegations in Paragraph 15, and specifically deny that Plaintiffs or Plaintiffs' predecessors in interest, licensees, and/or

affiliates have any exclusive rights in the TRADER Marks or TRADER domain names.

## Defendants' Wrongful Acts

16.    Defendant Winfield Dyco Holding Ltd. ("Winfield") admits that it registered substantially less than 130 domain names that contained the term "trader" in the domain name.  Defendant Natco Trading Company, Inc. ("Natco") admits that it registered substantially less than 130 domain names that contained the term "trader" in the domain name.  Defendants deny each and every remaining allegation in Paragraph 16, and specifically deny that Plaintiffs or Plaintiffs' predecessors in interest, licensees, and/or affiliates have any exclusive rights in the TRADER Marks or TRADER domain names.

17.    Defendants deny the allegations in Paragraph 17.

18.    Some of the allegations contained in Paragraph 18 call for a conclusion of law to which no response is required.  To the extent that a response is required, Defendants admit that they created websites that offered online classified advertising services to owners of various types of vehicles.  Defendants admit that some of the people who used these websites sought to sell their vehicle for money to other users of the website.  Defendants deny each and every remaining allegation in Paragraph 18, and specifically deny that Plaintiffs or

Plaintiffs' predecessors in interest, licensees, and/or affiliates have any exclusive rights in the TRADER Marks or TRADER domain names.

19.    Defendants admit that TPI Holdings and Trader Publishing Company filed Civil Action No. 1:06-CV-1600 in this District Court against Winfield, and alleged trademark infringement, unfair competition, and cybersquatting. Defendants deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 19, and on that basis, deny the same.

20.    Defendants admit the allegations in Paragraph 20.

21    Defendants admit that the Agreement provided that:

> Winfield hereby assigns, transfers, conveys, and delivers exclusively to TPI Holdings . . . and TPI Holdings hereby acquires from Winfield all of Winfield's right, title, and interest in and to (i) the Domain Names [defined earlier in the Agreement as <autotraderantiques.com>, <autotraderclassics.com>, <autotradercollectorcars.com>, <airplanetrader.com>, <oldcartrader.com>, <rvtrader.com>, variations on <rvtrader-[state].com> and other domain names that contain "trader" and a vehicle term] (except rvtrader-canada.com, rv-trader.ca, and boattradercanada.com, which would be transferred under the Canadian Agreement and which Winfield will not use even if it does not transfer under the Canadian Agreement . . .

Defendants further admit that the Agreement provided that:

> Except as expressly permitted in paragraph 7 below, from and after the Effective Date, Winfield shall not, directly or indirectly, register, seek to register, or otherwise make and trademark use of (but shall be permitted to use for meta-tag and keyword searching, for search engine optimization, and as descriptive terms, so long as any such use

6

does not cause a likelihood of confusion) any name, mark, or domain name that i) incorporates TRADER and any term for a vehicle (including but not limited to any words that refer to airplanes, boats, personal watercraft, cars, motorcycles, all terrain vehicles, trucks, and recreational vehicles); or ii) consists of or is confusingly similar to any of TIP Holdings' TRADER Marks.

Defendants deny each and every remaining allegation in Paragraph 21.

22.    Defendants admit that Paragraph 7 of the Agreement stated that Winfield was permitted to use the domain names <rvtrader.com>, <oldcartrader.com>, and <airplanetrader.com> (the "Phase-Out Domains") for a two-year Phase-Out Period.  Defendants further admit that the Paragraph 7 of the Agreement stated that during the first year of the Phase-Out Period Winfield could continue using the Phase-Out Domains, including using the Phase-Out Domains to conduct the same business under the same names and marks as Winfield conducted prior to the Effective Date of the Agreement.  Defendants further admit that Paragraph 7 of the Agreement stated that:

> By the first anniversary of the Effective Date, Winfield must change the [Phase-Out Domains] to names that do not contain the term "Trader", and the content of the sites shall contain no trademarks that include "Trader" (provided that Winfield shall be permitted to use words containing the term "Trader" for meta-tag and keyword searching, for search engine optimization, and for descriptive purposes, so long as such use does not cause a likelihood of confusion).

Defendants further admit that Paragraph 7 of the Agreement stated that by the first anniversary of the Effective Date, Winfield must install a splash directional page,

7

substantially in the form attached to the Agreement as Exhibit D.  Defendants deny each and every remaining allegation in Paragraph 22.

23.    Defendants deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 23, and on that basis, deny the same.

24.    Defendants deny each and every allegation in Paragraph 24.

25.    Defendants admit that they installed splash directional pages, so that the Phase-Out Domains resolve to these splash directional pages.  Defendants deny each and every remaining allegation in Paragraph 25.

26.    Defendants admit that they displayed the phrase, "Buyer  SELLER Trader POWERED" on the website located at <rvtrader.com>, as shown in Exhibit H.  Defendants further admit that they displayed the phrase, "Old Car Trader has a NEW NAME: Old Car Online.com," as shown in Exhibit I.  Defendants deny each and every remaining allegation in Paragraph 26.

27.    Defendants deny each and every allegation in Paragraph 27.

28.    Defendants admit that they registered the domain name <airplanetradeonline.com> and operate a website associated with this domain name.  Defendants deny each and every remaining allegation in Paragraph 28, and specifically deny that Plaintiffs or Plaintiffs' predecessors in interest, licensees,

and/or affiliates have any exclusive rights in the TRADER Marks or TRADER domain names.

29.    Defendants admit the allegations in Paragraph 29.

30.    Defendants admit that Plaintiffs and Defendants engaged in communications about the facts underlying this action prior to the filing of the action, including but not limited to communications about the splash directional pages. Defendants deny each and every remaining allegation in Paragraph 30.

31.    Paragraph 31 of the Amended Complaint contains conclusions of law to which no response is required. To the extent that a response is required, Defendants admit that Paragraph 10(a) of the Agreement states, "[c]onditioned upon fulfillment by Winfield of the undertakings set forth in this Agreement, TPI Holdings releases, acquits, and forever discharges Winfield . . . from any and all claims . . ." Defendants deny each and every remaining allegation in Paragraph 31.

## COUNT 1
## BREACH OF CONTRACT

32.    In response to Paragraph 32, Defendants incorporate their responses to Paragraphs 1 through 31, inclusive, with the same force and effect as if fully set forth herein.

33.    Paragraph 33 of the Amended Complaint contains conclusions of law to which no response is required. To the extent that a response is required, Defendants deny the same.

34.     Paragraph 34 of the Amended Complaint contains conclusions of law to which no response is required.   To the extent that a response is required, Defendants deny the same.

35.     Paragraph 35 of the Amended Complaint contains conclusions of law to which no response is required.   To the extent that a response is required, Defendants deny the same.

36.     Paragraph 36 of the Amended Complaint contains conclusions of law to which no response is required.   To the extent that a response is required, Defendants deny the same.

37.     Paragraph 37 of the Amended Complaint contains conclusions of law to which no response is required.   To the extent that a response is required, Defendants deny the same.

38.     Paragraph 38 of the Amended Complaint contains conclusions of law to which no response is required.   To the extent that a response is required, Defendants deny the same.

## COUNT II
## VIOLATION OF THE ANTICYBERSQUATTING CONSUMER PROTECTION ACT

39.     In response to Paragraph 39, Defendants incorporate their responses to Paragraphs 1 through 38, inclusive, with the same force and effect as if fully set forth herein.

40.     Paragraph 40 of the Amended Complaint contains conclusions of law to which no response is required.  To the extent that a response is required, Defendants deny the same.

41.     Paragraph 41 of the Amended Complaint contains conclusions of law to which no response is required.  To the extent that a response is required, Defendants deny the same.

42.     Paragraph 42 of the Amended Complaint contains conclusions of law to which no response is required.  To the extent that a response is required, Defendants deny the same.

43.     Paragraph 43 of the Amended Complaint contains conclusions of law to which no response is required.  To the extent that a response is required, Defendants deny the same.

44.     Paragraph 44 of the Amended Complaint contains conclusions of law to which no response is required.  To the extent that a response is required, Defendants deny the same.

### COUNT III
### FEDERAL TRADEMARK AND SERVICE MARK INFRINGEMENT

45.     In response to Paragraph 45, Defendants incorporate their responses to Paragraphs 1 through 44, inclusive, with the same force and effect as if fully set forth herein.

46.    Paragraph 46 of the Amended Complaint contains conclusions of law to which no response is required.  To the extent that a response is required, Defendants deny the same.

47.    Paragraph 47 of the Amended Complaint contains conclusions of law to which no response is required.  To the extent that a response is required, Defendants deny the same.

48.    Paragraph 48 of the Amended Complaint contains conclusions of law to which no response is required.  To the extent that a response is required, Defendants deny the same.

49.    Paragraph 49 of the Amended Complaint contains conclusions of law to which no response is required.  To the extent that a response is required, Defendants deny the same.

### COUNT IV
### FEDERAL UNFAIR COMPETITION

50.    In response to Paragraph 50, Defendants incorporate their responses to Paragraphs 1 through 49, inclusive, with the same force and effect as if fully set forth herein.

51.    Paragraph 51 of the Amended Complaint contains conclusions of law to which no response is required.  To the extent that a response is required, Defendants deny the same.

52.    Paragraph 52 of the Amended Complaint contains conclusions of law to which no response is required.    To the extent that a response is required, Defendants deny the same.

53.    Paragraph 53of the Amended Complaint contains conclusions of law to which no response is required.    To the extent that a response is required, Defendants deny the same.

54.    Paragraph 54 of the Amended Complaint contains conclusions of law to which no response is required.    To the extent that a response is required, Defendants deny the same.

## AFFIRMATIVE DEFENSES

Defendants set forth below their affirmative defenses.    Each defense is asserted as to all causes of action unless otherwise noted.    By setting forth these affirmative defenses, Defendants do not assume the burden of proving any fact, issue, or element of a cause of action where such burden properly belongs to Plaintiffs.    Moreover, nothing stated herein is intended or shall be construed as an acknowledgement that any particular issue or subject matter is relevant to Plaintiffs' allegations.

## FIRST AFFIRMATIVE DEFENSE
### (Failure to State Cause of Action)

As Defendants' First Affirmative Defense, Defendants assert that Plaintiffs have failed to state a cause of action upon which relief may be granted.    Plaintiffs

have failed to plead the prima facie elements of their asserted causes of action.

## SECOND AFFIRMATIVE DEFENSE
### (Unclean Hands)

As Defendants' Second Affirmative Defense, Defendants assert that Plaintiffs' claims are barred, in whole or in part, by the doctrine of unclean hands, because, on information and belief, Plaintiffs' purported TRADER trademarks, which serves as the basis for all of Plaintiff's claims, was obtained by a fraud on the United States Patent and Trademark Office and is not entitled to trademark protection. Additionally, Plaintiffs have engaged in anti-competitive behavior, in violation of the antitrust laws of the United States to obtain their purported rights in the TRADER marks.

## THIRD AFFIRMATIVE DEFENSE
### (Failure to Mitigate Damages)

As Defendants' Third Affirmative Defense, Defendants assert that Plaintiffs' claims are barred, in whole or in part, because Plaintiffs failed to use ordinary care and diligence to take all necessary steps to mitigate and minimize any damages Plaintiffs claim to have sustained and for which they seek recovery in this action.

## FOURTH AFFIRMATIVE DEFENSE
### (Superseding Events and Acts of Third Parties)

As Defendants' Fourth Affirmative Defense, Defendants assert that if Plaintiffs have sustained any injuries or incurred any adverse effect or losses, such adverse effect or losses, if any, were the result of intervening or superseding

events, factors, occurrences, conditions, or acts of third parties, which were in no way caused or controlled by Defendants and for which Defendants are not liable.

## FIFTH AFFIRMATIVE DEFENSE
### (In Pari Delicto)

As Defendants' Fifth Affirmative Defense, Defendants assert that any recovery herein by Plaintiffs is barred by the doctrine of in pari delicto, because Plaintiffs bear fault for the damages they suffered.

## SIXTH AFFIRMATIVE DEFENSE
### (Allocation of Fault)

As Defendants' Sixth Affirmative Defense, Defendants assert that damages, if any, were proximately caused by Plaintiffs and, therefore, require an allocation of fault.

## SEVENTH AFFIRMATIVE DEFENSE
### (Waiver and Estoppel)

As Defendants' Seventh Affirmative Defense, Defendants assert that Plaintiffs waived any claim or cause of action against Defendants for the acts alleged in the Complaint, and Plaintiffs should be estopped from bringing this lawsuit.

## EIGHTH AFFIRMATIVE DEFENSE
### (Abandonment)

As Defendants' Eighth Affirmative Defense, Defendants assert that to the extent that Plaintiff had acquired any rights in the TRADER marks, those rights

have long since been abandoned by Plaintiffs' failure to police the widespread third party use of the mark.

## ADDITIONAL AFFIRMATIVE DEFENSES

Defendants hereby give notice that they intend to rely on any additional affirmative defenses that become available or apparent during discovery and thus reserve the right to amend their answer to assert such additional affirmative defenses.

## **PRAYER FOR RELIEF**

WHEREFORE, having fully answered Plaintiffs' Amended Complaint and asserted the above affirmative defenses, Defendants pray that the action be dismissed with prejudice and costs as to Defendants.

## COUNTERCLAIM

Defendants and Cross-Plaintiffs, Winfield Dyco Holding Ltd. and Natco Trading Company, Inc. (collectively, "Cross-Plaintiffs"), by and through their undersigned attorneys, allege as follows:

### INTRODUCTION

1.      Cross-Defendants TPI Holdings, Inc. and Dominion Enterprises (collectively, "Cross-Defendants") base their amended complaint on their purported rights in a family of TRADER marks (the "TRADER Marks").

2.      The term "trader" is commonly used in all forms of commerce generically, to designate a person or entity who buys, sells, barters, or otherwise engages in commercial activity.  It is one of the most common and descriptive terms related to and describing commerce.

3.      Cross-Defendants have sought to co-opt this generic term, "trader," to monopolize a range of commercial activity, in particular the automobile, boat, airplane, vehicle, and real estate buying and selling markets (the "Industry").

4.      However, any rights that Cross-Defendants have purportedly obtained in the TRADER Marks were obtained by false and fraudulent statements made to the United States Patent and Trademark Office ("PTO").

5.      And once Cross-Defendants obtained these fraudulent trademark registrations, they used the registrations to strong arm their competitors into

17

entering into anti-competitive agreements, which granted Cross-Defendants unfair market power in the Industry, namely a unilateral right to use the generic term "trader."

6.    Cross-Defendants' misconduct constitutes fraud on the United States Patent and Trademark Office and a violation of the Sherman Antitrust Act.

7.    In one instance where Cross-Defendants sought to illegitimately increase their market power, they coerced a settlement agreement with Cross-Plaintiffs (the "Agreement").  Despite the unilateral benefits that Cross-Defendants obtained through the Agreement, Cross-Defendants have not upheld their obligations, and in fact, have committed material breaches of the Agreement.

## GENERAL ALLEGATIONS
### The Generic Term "Trader"

8.    The term "trader" has been used in the English language for over 1,000 years.

9.    The term "trader" simply means one who engages in commerce.

10.    The Oxford English Dictionary defines "trader" as "one whose business is trade or commerce or who is engaged in trading; a dealer or trafficker."

11.    Other dictionaries echo the Oxford English Dictionary's generic reference to commerce in defining the term "trader."

12.    For example, Merriam Webster defines "trader" as "a person whose business is buying and selling or barter: as a Merchant."

18

13.     Similarly, the Internet dictionary, located at <dictionary.com> defines "trader" as "a person who trades; a merchant or businessperson."

14.     For the average consumer, the term "trader" simply refers to a person or entity who buys, sells, or barters or otherwise engages in commercial activity.

15.     When the term "trader" is modified by another word, e.g. "*car* trader," the phrase refers to a person who buys, sells, barters, or otherwise engages in commerce regarding the modifier, e.g. cars.

16.     The average consumer doesn't understand the term "trader" to refer to anything other than commerce generally or one who engages in commerce generally.

17.     In the situation where the term "trader" is modified by another word, e.g. *"car* trader," the average consumer doesn't understand the phrase to refer to anything other than commerce generally related to the modifier, e.g. cars.

18.     There are countless businesses in the United States that use the term "trader" modified by the good or service the business is buying or selling.

19.     In just a few minutes of research, one can discover countless examples of the use of these generic phrases across numerous industries, in the form of "[good or service] trader," such as "jewelry trader," "sports trader," "house trader," "news trader," "cosmetics trader," "game trader," "golf club trader," etc.

//

## Cross-Defendants' Adoption of the TRADER Marks

20.    Cross-Defendants claim that they have acquired exclusive rights in a variety of marks that incorporate the term "trader" plus a generic modifier.

21.    As limited examples, Cross-Defendants claim that they have acquired exclusive rights in the trademarks AUTO TRADER, TRUCK TRADER, YACHT TRADER, and RV TRADER.

22.    Cross-Defendants began applying for U.S. trademark registrations in 1981 for the TRADER Marks.

23.    In their trademark applications, Cross-Defendants claimed use of the various TRADER Marks as early as 1974.

24.    To date, Cross-Defendants have applied for more than 80 trademark registrations for various TRADER Marks.

25.    In response to many of these trademark applications the PTO initially refused to register the mark, finding that the TRADER Mark at issue was purely descriptive of Cross-Defendants' goods and/or services.

26.    In such cases, Cross-Defendants sought to convince the PTO that the PTO was incorrect through supplemental filings.

27.    In these supplemental filings, Cross-Defendants made false and misleading statements in support of their trademark applications.  Specifically, Cross-Defendants have made false and misleading statements in response to PTO

office actions in which the PTO refused to register a mark because the term "trader" was purely descriptive of Cross-Defendants' good or services.

28.    On multiple occasions, Cross-Defendants have declared under penalty of perjury that they were unaware of third party use of any mark that was confusingly similar to a variety of their purported TRADER Marks, including but not limited to AUTO TRADER, HOUSE TRADER, TRUCK TRADER, and BOAT TRADER.

29.    These statements were false.  At the time Cross-Defendants made these representations to the PTO, Cross-Defendants knew or should have known of extensive legitimate third party use of marks and phrases that incorporate the term "trader" and that were identical or highly similar to marks at issue in Cross-Defendants' trademark applications.

30.    As one limited example of the extensive third party use of the TRADER Marks, in excess of 10,000 registered Internet domain names currently exist that incorporate the terms "auto" and "trader" in that order.  On information and belief, the vast majority of these domain names are not owned by Cross-Defendants.  On information and belief, most of these domain names resolve to websites that are unaffiliated with Cross-Defendants.  Millions of consumers visit these websites each month.

31.    Moreover, on multiple occasions, Cross-Defendants claimed that consumers associated the term "trader" modified by a generic term such as "auto," "boat," "truck," or "house," with Cross-Defendants and Cross-Defendants' goods or services.  On information and belief, these statements were pure speculation, and Cross-Defendants possessed no evidence to support their claim, and certainly provided no such evidence to the PTO.  On information and belief, Cross-Defendants knew or should have known that the statements were unsupported speculation at the time they made them to the PTO.

32.    Perhaps most egregious, once Cross-Defendants unlawfully obtained one trademark registration for a TRADER Mark, they bootstrapped that registration into additional trademark registrations for other TRADER Marks.

33.    Specifically, on multiple occasions, after the PTO had initially refused to register one of Cross-Defendants' purported TRADER marks, Cross-Defendants referred the PTO to Cross-Defendants' unlawfully obtained prior registrations and stated that the PTO "has already spoken to the inherent distinctiveness of Applicant's 'TRADER' marks.  In that regard, Applicant is the owner of numerous registrations for 'TRADER' marks, each of which registered on the basis of their inherent distinctiveness . . ."   Cross-Defendants knew or should have known that the statements were false and misleading at the time they made these statements to the PTO.

22

34.    On information and belief, the PTO in large part—if not completely—relied on Cross-Defendants' false and misleading references to their prior registrations in granting additional registrations to Cross-Defendants for the TRADER Marks.

## The Relevant Market

35.    Cross-Defendants create and distribute hard copy and online publications that advertise automobile, boat, airplane, vehicle, and real estate buying and selling markets (the "Industry").

36.    Countless other businesses also seek to engage in commerce in the Industry, namely by creating, distributing, or otherwise facilitating publications that advertise the automobile, boat, airplane, vehicle, and real estate buying and selling markets.

37.    Many of these other businesses have used the term "trader" in a generic capacity to describe their businesses as engaged in a particular type of commerce, by using the term "trader" modified by another generic term, *e.g.* "car," "jewelry," "cosmetics."

38.    Consumers throughout the country understand the term "trader" to refer to commerce generally, and publications that offer a particular type of commerce when the term "trader" is modified by a generic descriptor.    On

information and belief, most consumers do not associate the term "trader" with Cross-Defendants' publications.

39.    Thus, each month, nearly 10 million Internet users perform Google searches on the term "trader."

40.    Similarly tens of thousands of Internet users search for the following generic phrases each month, "car trader," "horse trader," "gun trader," "game trader," etc.

41.    On information and belief, most of these Internet users, who search for the term "trader," are not searching for Cross-Defendants' publications. Rather they are searching for the term "trader" in its generic sense and looking for businesses that buy, sell, or otherwise facilitate commerce in a certain good or service, whether it be cars, horses, guns, or games.

42.    Because the term "trader" has come to signify to consumers a business or entity that engages in a certain type of commerce, it is impracticable if not impossible for a business to compete successfully in the Industry without using the term "trader."

43.    Importantly, the average consumer's interpretation of the term "trader" is not a result of any goodwill that Cross-Defendants have developed for their purported TRADER Marks. Rather, this interpretation results from the fact that the average consumer understands the term "trader" to serve as one of the few

key words that refers to a business that engages in commerce generally or a specific type of commerce when the term "trader" is modified by a generic descriptor.

44.    As a result, the term "trader" is a generic term for one who engages in commerce, and the term "trader" as modified by a descriptor is a generic term for one who engages in commerce related to the descriptor (*e.g.* "car trader").

45.    And as a final result, it is necessary for a business to use the term "trader" to compete in the Industry, particularly where a larger and larger portion of the Industry derives from Internet searches, which often incorporate the term "trader."

## Cross-Defendants Squelch Competition with Anti-Competitive Agreements

46.    Since    Cross-Defendants    obtained    their    unlawful    trademark registrations for the TRADER Marks, they have used these registrations to drive out competition in their market: *i.e.* hard copy and online publications that promote buying or selling of cars, boats, other vehicles, houses, etc.

47.    Specifically, Cross-Defendants have aggressively sent demand letters to numerous businesses that used the "term" trader in close proximity to a generic modifier (such as "auto," "boat," "truck," or "house").

48.    In most cases these businesses used the term "trader" in its most generic sense as referring to a business engaged in commerce of a specified good or service—as explained by the modifying term (e.g. "car trader").

49.    Notwithstanding the generic nature of the third parties' use, Cross-Defendants accused these businesses of trademark infringement, based on Cross-Defendants' fraudulently obtained trademark registrations of the TRADER Marks.

50.    In these letters, Cross-Defendants demanded that the recipients immediately cease using the term "trader" in connection with a generic modifier (such as "auto," "boat," "truck," or "house") "in any way whatsoever, including without limitation as a domain name, business name or website."

51.    In these letters, Cross-Defendants also demanded that the recipients abandon any trademark applications for any mark that contained the term "trader."

52.    In these letters, Cross-Defendants also demanded that the recipient transfer domain names containing the term "trader" to Cross-Defendants.

53.    On information and belief, Cross-Defendants took these actions knowing that their trademark registrations were based on false and misleading representations to the PTO.

54.    On information and belief, Cross-Defendants have required numerous third parties to enter into agreements, whereby the third parties forfeited their legitimate right to use the term "trader" in the Industry.

26

55.    As a result of Cross-Defendants' conduct and their agreements with third parties, Cross-Defendants have prevented their competitors from using the term "trader," a term that is necessary to succeed in the Industry.

56.    Cross-Defendants' actions were equivalent to asking a sock vendor to sell socks without using the term "socks."

57.    Consumers looking for businesses engaged in the Industry will frequently if not primarily search for businesses using the term "trader" without any particular goal of finding Cross-Defendants' publications as opposed to the publications of Cross-Defendants' competitors.

58.    Thus, through their agreements, Cross-Defendants have sought to prevent their competitors from succeeding in the Industry, while granting themselves an unfair competitive advantage.

59.    The ultimate result of Cross-Defendants' misconduct is a decrease in economic efficiency, and making the Industry less rather than more competitive.

**Cross-Defendants Material Breach the Settlement Agreement
with Cross-Plaintiffs**

60.    In or before 2006, Cross-Defendants discovered that Cross-Plaintiffs had used the term "trader" on Cross-Plaintiffs' Internet websites.

61.    Cross-Defendants subsequently filed a lawsuit in this Court, Case No. 1:06-CV-1600 (the "Underlying Lawsuit").

27

62.    The parties to the Underlying Lawsuit subsequently entered into a settlement agreement (the "Agreement").

63.    Among other things, the Agreement granted to Cross-Plaintiffs, for a period of two-years, "the exclusive right to continue using e-mail addresses that include "'@rvtrader.com' or '@oldcartrader.com' or '@airplanetrader.com.'"  The Agreement further provides that "TPI Holdings shall not be permitted to use e-mail addresses that include said phrases."  (Agreement ¶7(c).)

64.    Notwithstanding the terms of the Agreement, during the two-year period following the Effective Date of the Agreement, Cross-Defendants have regularly displayed these email addresses to promote their businesses and engage in interactions with consumers.

65.    Despite requests by Cross-Plaintiffs for Cross-Defendants to cease using these email addresses, Cross-Defendants have refused to comply.

66.    As a result of Cross-Defendants' breach, correspondence intended for Cross-Plaintiffs was not received, and correspondence intended for Cross-Defendants was delivered to Cross-Plaintiffs.

67.    Moreover, Paragraph 8(b) of the Agreement specified, "[i]n the event TPI Holdings receives any communication from any third party respecting the Continuing Sites, TPI Holdings will promptly forward such communications to

Winfield . . ." As a result of Cross-Defendants' breaches described above, Cross-Defendants breached this provision of the Agreement as well.

68.    Additionally the Agreement required Cross-Defendants, for a period of two-years, to "pay for, and maintain SSL certificates for rvtrader.com, oldcartrader.com, and airplanetrader.com." (Agreement ¶8(a).)

69.    Cross-Defendants never paid for, acquired, or otherwise maintained SSL certificates for rvtrader.com, oldcartrader.com, and airplanetrader.com as required under the Agreement.

70.    As a result of Cross-Defendants' various breaches, Cross-Plaintiffs were substantially harmed and did not receive the benefit of their bargain, as memorialized in the Agreement.

## FIRST CAUSE OF ACTION
### (For Fraudulent Registration of Trademark under 15 U.S.C. §§1119, 1120)

71.    Cross-Plaintiffs repeat, reallege, and incorporate each and every allegation set forth in paragraphs 1 through 70 of this cross-complaint.

72.    Through their material misrepresentations and omissions in their numerous applications for the TRADER Marks, as described above, Cross-Defendants have perpetrated a fraud on the PTO.

73.    Cross-Defendants knew, or should have known, that their material misrepresentations and omissions were untrue at the time they made them in the applications for the TRADER Marks.

74.    Cross-Defendants made their material misrepresentations and omissions to procure registration for the TRADER Marks to which Cross-Defendants were not entitled.

75.    On information and belief, the PTO relied on Cross-Defendants' misrepresentations and omissions in deciding to approve Cross-Defendants' applications for the TRADER Marks.

76.    As a result of Cross-Defendants' misconduct, Cross-Plaintiffs have been substantially harmed and have no adequate remedy in law.

### SECOND CAUSE OF ACTION
### (For Anti-Competitive Behavior under 15 U.S.C. §§1, 2, 15)

77.    Cross-Plaintiffs repeat, reallege, and incorporate each and every allegation set forth in paragraphs 1 through 76 of this cross-complaint.

78.    The term "trader" is a generic term, which businesses must use to compete successfully in the Industry.

79.    Cross-Defendants have sought to prevent Cross-Plaintiffs and numerous third parties from using the term "trader," even though Cross-Defendants have no legitimate right to exclude others from using it.

80.    Through their efforts, Cross-Defendants have attempted to monopolize and have in fact monopolized the trade and commerce among the states, in particular within the Industry, in violation of 15 U.S.C. §2.

81.     Cross-Defendants have purposely attempted to restrain trade and commerce and have in fact restrained trade and commerce among the States, in particular within the Industry, by negotiating, drafting, and entering into contracts with third parties, which contracts prevent the third parties from using the term "trader" in combination with generic descriptors, in violation of 15 U.S.C. §1.

82.     As a result of Cross-Defendants' misconduct, Cross-Defendants have imposed unreasonable and significant restraints on competition in the relevant market, and Cross-Defendants' misconduct has had no pro-competitive benefits or justification.

83.     As a result of Cross-Defendants' misconduct, Cross-Plaintiffs have been substantially harmed.

## THIRD CAUSE OF ACTION
### (For Breach of Contract)

84.     Cross-Plaintiffs repeat, reallege, and incorporate each and every allegation set forth in paragraphs 1 through 83 of this cross-complaint.

85.     Cross-Plaintiffs and Cross-Defendants entered into a valid agreement in settlement of the Underlying Action, which agreement was supported by valuable consideration.

86.     In material breach of the Agreement, Cross-Defendants did not cease displaying the email "addresses@rvtrader.com" or "@oldcartrader.com" or "@airplanetrader.com" as required by the Agreement.

87.    In material breach of the Agreement, Cross-Defendants did not promptly forward all communications it received intended for cross-Plaintiffs.

88.    In material breach of the Agreement, Cross-Defendants did not pay for, acquire, or maintain SSL certificates for rvtrader.com, oldcartrader.com, and airplanetrader.com.

89.    Cross-Plaintiffs were in substantial compliance with the Agreement.

90.    As a result of Cross-Defendants material breaches, Cross-Plaintiffs were substantially harmed.

## **PRAYER FOR RELIEF**

WHEREFORE, Cross-Plaintiffs pray that this Court enter judgment in their favor on the claims set forth above, and further pray that the Court:

1.    Find that Cross-Defendants have:

   a.   Committed fraud on the United States Patent and Trademark Office in violation of 15 U.S.C. §1120.

   b.   Committed violations of the Sherman Antitrust Act in violation of 15 U.S.C. §§1, 2, 15.

   c.   Committed breach of contract in violation of the Georgia common law.

2.    Cancel Cross-Defendants' various United States trademark registrations for the TRADER Marks pursuant to 15 U.S.C. §1119.

3.       Award Cross-Plaintiffs damages as follows:

    a.  Compensatory damages in an amount to be determined at trial, pursuant to 15 U.S.C. §1120;

    b.  Treble damages in an amount to be determined at trial pursuant to 15 U.S.C. §15;

    c.  Actual damages pursuant to Georgia common law.

4.       Award costs and attorneys' fees pursuant to 15 U.S.C. §15.

5.       Award Cross-Plaintiffs pre-judgment and post-judgment interest; and

4.       Order such other relief to which Cross-Plaintiffs may be entitled as a matter of law or equity, or which the Court determines to be just and proper.


Dated the 20th of November, 2009.          Respectfully submitted,



                                       By: s/ Karl S. Kronenberger
                                          Karl S. Kronenberger
                                        Georgia Bar No. 429898

                                       Attorneys for Defendants, WINFIELD DYCO HOLDING LTD., and NATCO TRADING COMPANY, INC.

KRONENBERGER BURGOYNE LLP
150 Post Street, Suite 520
San Francisco, CA 94108
Telephone: (415) 955-1155
Facsimile: (415) 955-1158
Karl@KBInternetLaw.com

## <u>DEMAND FOR JURY TRIAL</u>

Cross-Plaintiffs hereby request that this case be tried by a jury as to all issues triable by a jury.

Dated the 20th of November, 2009.          Respectfully submitted,


By: s/ Karl S. Kronenberger _____
    Karl S. Kronenberger
    Georgia Bar No. 429898

Attorneys for Defendants, WINFIELD DYCO HOLDING LTD., and NATCO TRADING COMPANY, INC.

KRONENBERGER BURGOYNE LLP
150 Post Street, Suite 520
San Francisco, CA 94108
Telephone: (415) 955-1155
Facsimile: (415) 955-1158
Karl@KBInternetLaw.com

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1D, the attached pleading complies with the font and point selections prescribed by Local Rule 5.1B and uses 14 point Times New Roman Font.

**KRONENBERGER BURGOYNE, LLP**


By: s/Karl S. Kronenberger
        Karl S. Kronenberger